UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------ x
JAMES T. HANOPHY,  :
  :
                                        Plaintiff,  :
  :
          - against -  :         06 CV 15370 (RMB) (HP)
  :
CONSOLIDATED EDISON COMPANY  :
OF NEW YORK, INC.,  :
  :
                                     Defendant.  :
  :
------------------------------------------------------------ x

## DEFENDANT'S LOCAL CIVIL RULE 56.1 STATEMENT

Defendant Consolidated Edison Company of New York, Inc. ("Con Edison" or "Company"), by its attorneys, submits this statement of undisputed material facts, pursuant to Rule 56.1 of the Local Civil Rules of the United States District Court for the Southern District of New York, in support of its motion for summary judgment.

1. Con Edison is a privately owned utility company that provides electric, gas, and steam service in New York City and Westchester County. (Carey Aff. ¶2)[1]

2. Plaintiff, James T. Hanophy, who retired on August 1, 2005, was born on March 11, 1947, and hired by Con Edison in 1966 as a Utility Mechanic (C4,7).

3. Throughout plaintiff's employment with the Company he has always been a bargaining unit member covered by the collective bargaining agreement ("CBA")

---

[1] All documents cited in this brief are attached as exhibits to the Affirmation of Barbara Carey, submitted in support of this motion References to paragraphs of that Affirmation are cited as "Carey ¶#." References to documents in the Affirmation are cited by the letters identifying the exhibit tabs to the Affirmation, for example, Con Edison Human Resources documents are identified as "CEH" with the Bates-stamp number of the page cited (as, "CEH115"). The identity of the groups of documents under each tab are set forth in the Carey Affirmation. References to the paragraphs of the complaint in this action are designated "C#."

between Con Edison and Local 1-2 of the Utility Workers Union of America. (P69).

4. On June 25, 1982, while working on the street as an "A" Mechanic, plaintiff was hit by a motorcycle. As a result of this on the job accident, plaintiff had a below-knee amputation, and was fitted for a prosthesis (P67).

5. After his recuperation, the Company placed him in, and trained him for, a desk job (P246-7).

6. In 1989 plaintiff was promoted to the position of Senior Coordinator, Gas Operations, with a wage rate higher than his Mechanic A position (CBA 1989), which he held for 16 years, until he retired on August 1, 2005 (P67-70).

7. As Senior Coordinator, plaintiff's responsibilities were to "make appointments with customers for various meter change-outs, schedule employees to go and do gas distribution work in the field (P79), input information (including codes for employees' time sheet, sick absence, lost time, and vacation time information (P73-4) into Con Edison's computer systems, and cover for some of his co-workers when they were out (CEK8).

8. While plaintiff was assigned to Queens Gas Operations Support, as a Senior Coordinator, Scott Kalberer was his Manager. Kalberer held that title until May 2005 (CEK6).

9. Kalberer consistently gave plaintiff satisfactory to superior performance evaluations (CEK15).

10. Plaintiff testified at his deposition that he was fully able to perform his Senior Coordinator job duties. (P74-5).

11. Specifically, plaintiff stated during his deposition that he regularly drove to work,

and to OHD appointments (the latter being a trip he estimated at one to two hours each way); that he climbed stairs every work day to get to his second floor office at Con Edison, and that he was able to walk at least half the time without assistance of even a cane (P392-3,48, 87-8). "If nothing was bothering me, I didn't use the cane." (P442-444).

12. Plaintiff also told SSA that his Senior Coordinator job included his climbing stairs every day (SSA Disability Report, p.3). He testified that he could pick up a 50-pound object (P118), and asserted in his SSD Report (part of his SSD application) that he frequently (from 1/3 to 2/3 of the workday) lifted weights of less than 10 lbs. (SSA Disability Report p.3). He also asserted in his SSD Report that he walked one hour per day in his job, bent down and forward at the waist for one hour per day, and crouched for 1 hour per day (*Id.*). He told SSA that he was able to go out alone, and when out, that he traveled by walking, riding in, or driving a car (SSA Function Report, p.4). He testified at his deposition that at home he engaged in gardening on his hands and knees in a 24-by-20 foot garden (P125-6), and that at work he was able to perform all the functions of his job, without any accommodation (P74-5).

13. The Company has a very generous sick pay allowance, which is detailed in the CBA with plaintiff's union. In any 52 consecutive weeks, an employee is entitled to one week's pay for each year of service, followed by 80% pay for up to 26 additional weeks. This sick allowance is renewed with each return to work (CBA 2000-2004, 40-41; 2004-2008, pp. 40-42).

14. Consistent with and pursuant to the CBA, the Company has established two policies: "Medical Visits – Weekly Employees," and "Company Sick Allowance –

Control and Payments (CEMP1-5, CEMP11-16).

15. Since at least December 2000, the "Medical Visits" policy has provided that medical visits at the Company's OHD facilities may be scheduled for various reasons, including "sick absence evaluations (i.e. to determine if employee is ready to return to duty, etc.)," "restriction evaluations," "duty status evaluations (i.e. to determine if employee is capable of performing assigned duties)," "job fitness evaluations," and "random drug testing" (CEMP1, 4).

16. In addition, the "Medical Visits" policy states, that "[i]f the employee is too sick to keep the appointment, his/her physician must speak to the Occupational Health Case Manager . . . to obtain administrative approval to reschedule the appointment" (CEMP5).

17. The "Company Sick Allowance" policy has similarly provided, since at least December 2000, that sick pay allowance "will be withheld by Occupational Health decision" if the "employee fails to report for a medical examination or refuses to be examined by a Company physician on the day of the illness or injury, or as soon as it is medically appropriate as determined by Occupational Health," (CEMP15-16). Failure to report is considered a form of insubordination and can form the basis for discipline (CEP70,86,89,90).

18. The "Company Sick Allowance" policy also provides that (1) employees in plaintiff's union are required to submit medical certification for absences, (2) such certification "through Occupational Health and an acceptable report from the employee's personal physician, is required for the payment of Company sick allowance for absences in excess of two days," and (3) "[w]here conditions warrant, in an individual case and based on the employee's record of absences, more

frequent and/or detailed certification may be required by Occupational Health or the employee's department" (CEMP 14-15).

19. In other words, although an employee is not permitted to be paid Company sick allowance for absences in excess of two days without OHD or personal physician's certification, more frequent or detailed certification may also be required. The information in these certifications is kept confidential by OHD and not shared with the employee's department (L.Aff.¶6).

20. Both the 2000-2004 CBA and the 2004-2008 CBA state:

> Certification of illness or injury, either through the Company's medical service or through an acceptable report from the employee's personal physician, is required for the payment of Company Sick Allowance for illness or injury causing absences in excess of two (2) days.

Art. IX, §39(a) (CBA 2000-2004, 2004-2008). The 2004-2008 CBA also states that "[a]ny payment for Company Sick Allowance is not considered earned until the absence in question has been approved by the Company's medical service (*Id.,*).

21. Over the years, plaintiff had many absences due to ulcers (erosion of outer layers of skin) [L.Aff.¶14) that developed from the contact between his prosthesis and the skin on his leg. He also required time off to see the maker of the prosthesis, to have the prosthesis adjust or a new one fitted (P168).

22. Plaintiff also had numerous absences over the years related to ailments ranging from sinusitis and pharyngitis to leg ulcers, lower back pain, and a hip replacement (P19-20, CEM671; C10, CEW1455, PE118).

23. During these absences, in accordance with Company policy and practice, plaintiff, like other similarly situated employees, was required to make periodic visits to OHD in order to permit the Company's doctors to assess his continuing eligibility for sick pay and his actual or expected fitness to return to work (P277-278,281).

24. The general policy and practice of OHD is to have the doctor who sees the employee make a determination of the appropriate date for a follow-up visit, based on his or her assessment of the date by which the employee's condition would most likely show improvement or change. This judgment is generally made based on the employee's current condition, combined with a review of any submissions by the employee's personal physician (P272-3; L. Aff.).

25. Under the Company's policy, if an employee is too sick to keep the appointment, his/her physician must speak to the Occupational Health Case Manager to obtain administrative approval to reschedule the appointment. Generally speaking, if the employee does not do so, he or she will not be paid for the day, and may be disciplined (CEL2).

26. Employees who are unable to work are entitled to take time off with pay; employees who have recovered sufficiently to perform work are expected to return to work (L.Aff.¶7).

27. Con Edison never penalized plaintiff in any way for his multiple lengthy paid sick absences. In fact, plaintiff's performance evaluations ranged from satisfactory to superior and he was granted appropriate pay increases under the CBA (CEH154-156, 178-193,P337).

28. On February 9, 2004, plaintiff was given a verbal warning for failing to report for a scheduled OHD visit as required by policy and the CBA. (CEHP11,CEK18).

29. Plaintiff nonetheless received a satisfactory performance evaluation on June 27, 2004 including the full CBA increase available (CEH154-156, 178-193).

30. In February and March 2005, Plaintiff was taking a combination of pain and blood pressure medications that resulted in his being sleepy during the day (CEM653).

31. Plaintiff admits that he fell asleep at work as a result of these medications (C29).

32. Although Kalberer was not aware that plaintiff was taking medications, he did notice plaintiff asleep in his chair at his desk (CEH126,K86-88).

33. On one of these occasions, March 1, 2005, Kalberer notified Stephanie Ullah-Mazzuca, who also saw plaintiff asleep at his desk. Kalberer was concerned that plaintiff might fall off his chair and injure himself (*Id.*, CEM628).

34. The company has a policy for initiating the assistance of the OHD in situations where employees act in an aberrant fashion, such as by falling asleep at their work stations: the supervisor submits forms to OHD requesting a "Job Fitness Evaluation," commonly known at Con Edison as a "JFE" (L. Aff.¶¶5,15;L88).

35. Kalberer requested a JFE for plaintiff. OHD granted the request, and plaintiff thereupon participated in the various routine aspects of the JFE including being seen by OHD and going for tests, including a drug test (L75-7, P318).

36. It was determined that plaintiff's drowsiness could have come from his having sleep apnea and/or his taking certain prescription drugs. OHD determined that he could return to work, but imposed the standard restriction (limitation on work functions) for employees who appear drowsy on the job: no work involving the safety of others (CEHP20).

37. By chance, plaintiff's name came up for a random drug test (pursuant to the CBA and Company drug policy) the same day as the JFE, so he ended up being tested twice (P196-7, 297-9).

38. Plaintiff's doctor advised him to change the time he took his blood pressure medication to the evening. Plaintiff did so. He testified that after making this change, he was no longer drowsy at work (CEM653-44).

39. In order for his restriction to be lifted, however, OHD needed a letter from his doctor stating that the problem had been resolved and told plaintiff so (P84,191-2) (CEM659)

40. Instead, OHD received a letter from a nurse practitioner, stating that plaintiff had changed his time he took his medication, and noting that this "Hopefully will relieve symptoms of sleepiness. If no improvement will need followup here" (CEM658).

41. Plaintiff was told that this note was insufficient (CEM0642). He apparently then made repeated attempts to get his physician to give OHD a definite statement that the problem had in fact been resolved (PE181,208), but none was ever received; nor does plaintiff claim that one was sent. As a result, the restriction remained (CEM653-44;L83,85).

42. Plaintiff was permitted to continue to work at his Senior Coordinator job until the time he retired (C7).

43. Plaintiff notified the Company of his intention to retire on or before June 13, 2005 (PE214).

44. On July 26, 2005, he filed an application for Social Security Disability benefits, claiming that he had become unable to work as of July 12, 2005 (SSA).

45. He retired on August 1, 2005 (C7).

46. Plaintiff was not replaced, and his work was divided among a group of clerical employees in their fifties in his department, including Walter Eberle, who plaintiff admits was 51 years old (P345-6).

47. Plaintiff testified during his employment that he never went to Con Edison's Equal Employment Affairs Department to raise a complaint of any kind (P80-81).

48. Plaintiff testified that no one ever expressed the intention of embarrassing him, challenging his competence or undercutting his effectiveness (P294).

Dated: New York, New York
January 14, 2008

          Respectfully Submitted,

          MARY SCHUETTE  (MS-4752)
          Attorney for Defendant
          Consolidated Edison Company
            of New York, Inc.,
          4 Irving Place, 1815-S
          New York, New York 10003
          (212) 460-2496

          By: /s/ Barbara Jane Carey
              Barbara Jane Carey (BC 6895)
              (212) 460-1122

TO:

Jeffrey F. Pam, Esq.
Attorney for Plaintiff
529 May Lane
East Meadow, NY 11554.

284072